IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY P. ERICKSON, | ) | CASE NO. 5:25-cv-01606-SL |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Gregory P. Erickson ("Erickson") seeks judicial review of the final decision of

the Commissioner of Social Security, denying his application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")

applied proper legal standards, I recommend that the Commissioner's final decision denying

Erickson's applications for DIB and SSI be affirmed.

## II.     Procedural History

Erickson protectively filed for DIB and SSI on January 6, 2023, alleging a disability

onset date of November 20, 2021. (Tr. 228). The claims were denied initially and on

reconsideration. (Tr. 82, 101, 102, 113). Erickson then requested a hearing before an ALJ. (Tr.

149-50). Erickson, represented by counsel, and a Vocational Expert ("VE") testified before an

ALJ on June 24, 2024 (Tr. 39-81). On August 19, 2024, the ALJ issued a written decision

finding Erickson not disabled. (Tr. 14-32). The Appeals Council denied his request for review on

1

July 1, 2025, rendering the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981). Erickson timely filed this action on August 1, 2025. (ECF Doc. 1).

### III.  Evidence

#### A.  Personal, Educational, and Vocational Evidence

Erickson was born July 10, 1970. (Tr. 83). He was 51 years old on his alleged onset date, making him an individual closely approaching advanced age according to agency regulations. (Tr. 83). He has at least a high school education. (Tr. 31). He has no past relevant work. (*Id.*).

#### B.  Relevant Medical Evidence

On November 20, 2021, Erickson presented at the Grady Memorial Hospital Emergency Department complaining of facial numbness, head numbness, and leg numbness. (Tr. 1557). He reported that the symptoms began earlier in the day, and noted that he was not experiencing visual disturbance or a headache. (*Id.*). Erickson added that when he experienced the symptoms earlier EMS had been called, but he refused transport because the symnptoms had improved. (*Id.*). The symptoms returned, however, when he was driving home, and he also felt lightheaded and dizzy, leading to his emergency department visit. (*Id.*). Erickson reported having similar neurologic symptoms in the past when experiencing stress and pressure. (*Id.*).

Erickson attended an office visit on December 8, 2021 with Dmitri Kolychev, M.D., in the Summa Health Department of Neurological Sciences, and reported constant dizziness and subjective gait instability for two to three weeks, as well as two episodes of associated non-specific confusion, anxiety, and bilateral facial tingling. (Tr. 1445). Dr. Kolychev noted his wide-based gait, though he was able to tandem well, his Romberg was normal, and his Dix-Hallpike was negative for nystagmus. (*Id.*). Erickson's head impulse test was borderline for left-

sided weakness, and he was not orthostatic. (*Id.*). A review of Erickson's brain MRI showed few non-specific subcortical FLAIR hyperintensities and no evidence of prior strokes or periventricular lesions concerning for demyelinating disease. (Tr. 1445-46). Dr. Kolychev considered diagnoses of peripheral vertigo, vestibular migraines and presyncope, and determined that, while he could not rule it out, recurrent small vessel TIA was unlikely. (Tr. 1446).

At a December 21, 2021 appointment with Leo Clavecilla, M.D., his primary care physician, Erickson reported he was still experiencing neurological symptoms, and at times was having short periods of inability to get words out. (Tr. 1436). He also had experienced pinpoint pupils and periods of dizziness. (*Id.*). The dizziness was brought on while in a car, and he could not drive over 25 M.P.H. without becoming dizzy. (*Id.*). He reported feeling very stressed due to work, finances, and his medical conditions. (*Id.*). His assessment included neuropathy and transient neurological deficit, and Dr. Clavecilla wrote that Erickson had "significant [symptoms] but thus far [work-up] has been unrevealing." (Tr. 1439-40).

On January 1, 2022, Erickson presented to the emergency department complaining that he felt chilled and he had a near syncopal feeling earlier. (Tr. 532). He further complained of lightheadedness, low back discomfort, and frequent urination. (Tr. 537). The treating physician felt it was a "strong possibility" Erickson's symptoms were caused by an anxiety attack. (*Id.*). At a February 4, 2022 appointment Malissa Ayers, PA-C, of the Cleveland Clinic Center for General Neurology, noted that Erickson's recent brain MRI and Head/Neck CTAs had shown no more than mild findings, and that a Tilt Table test on January 26, 2022 had been positive and diagnostic for reflex vasovagal syncope with predominant vasodepressor response. (Tr. 522). PA Ayers expressed that she felt Erickson's symptoms were likely brought on by anxiety. (*Id.*).

3

Erickson underwent a physical therapy evaluation on March 1, 2022. (Tr. 516-20). His chief complaints included dizziness, presyncope, head and neck pain, ear pressure, and tinnitus. (*Id.*). His physical therapist noted prior diagnoses including left peripheral vestibular hypofunction, reflex vasovagal syncope, and anxiety, causing impairment of balance, independence in exercise, overall function, range of motion, stress management, and gaze stabilization. (*Id.*). Erickson's physical therapist felt he had a good prognosis. (*Id.*). Erickson completed 13 sessions of physical therapy, and was discharged due to "goal achievement." (Tr. 478).

At a follow-up visit with PA Ayers on April 22, 2022, Erickson described ongoing headaches, but noted his dizziness had improved with physical therapy. (Tr. 502). Erickson expressed concern that his symmptoms may have been caused by COVID, due to ringing and fullness in his left ear and swelling around the lymph nodes in the left side of his neck, although he had not been tested for COVID when his symptoms began. (*Id.*). PA Ayers felt his headaches were tension headaches, and recommended repeat imaging in June to ensure there was no demyelination. (Tr. 504).

Erickson underwent both a brain and cervical spine MRI on July 19, 2022 which showed only scattered patchy T2 hyperintensity in the bilateral supratentorial white, most likely representing chronic microvascular ischemia and cervical spondylosis superimposed on a developmentally narrow canal without high-grade canal or foraminal compromise, most significant at C6-7. (Tr. 376-77). On August 19, 2022, Erickson presented for follow-up with Christopher Carmichael, D.O. (Tr. 368). Dr. Carnmichael noted the recent mostly unremarkable findings from the brain and cervical spine MRI, and also that he had been seen by an ENT two weeks prior to address dysequilibrium and left-sided tinnitus. (*Id.*). Erickson reported ongoing

symptoms including dizziness worst when driving or at the end of the day, feeling he will pass out, sensation of "brain vibration," hearing loss, and the sensation of "heart pounding." (Tr. 368-69). Erickson further expressed that he thought he might be suffering from long COVID, and Dr. Carmichael referred him to a long COVID clinic. (*Id.*).

On September 28, 2022, Erickson had an audiologic evaluation. (Tr. 472). His complaints included dizziness/vertigo/imbalance and tinnitus, otalgia, and pressure/fullness of the left ear. (*Id.*). He was assessed with bilateral sensorineural hearing loss ("SNHL"), with audiometry results showing his right ear to be within normal limits with mild SNHL at 4,000-6,000Hz, and his left ear within normal limits through 2,000Hz, then sloping to mild SNHL. (Tr. 473).

On September 29, 2022, Erickson attended a psychotherapy intake at Wellness Grove. (Tr. 470-73). He reported he has struggled with depression and anxiety symptoms for many years, which included panic attacks that occurred several times per month. (Tr. 741). He had a history of treating his symptoms with therapy and medications. (*Id.*). He was diagnosed with illness anxiety disorder; generalized anxiety disorder with panic attacks; major depressive disorder, recurrent episode, moderate; and other problems related to employment, and the counselor recommended weekly telehealth sessions. (Tr. 473).

Erickson underwent a vestibular test battery on October 5, 2022, with the overall impression being that his was a normal and symmetrical vestibular evaluation, suggesting a low likelihood of an active inner ear involvement to account for his symptoms. (Tr. 561). He then attended an office visit with Samantha Zaczyk, O.D., of Northeast Ohio Eye Surgeons on October 19, 2022, and relayed that he "assumed" he had contracted COVID about a year ago, and had experienced vision issues ever since. (Tr. 711). His vestibular therapist instructed him to ask about his central peripheral vision issues, that included poor peripheral vision and depth

perception. (*Id.*). He reported "visual intensity" and "visual disconnect," and that he often feels like he will pass out when he enters a store. (*Id.*). He then began visual therapy on November 4, 2022, to address convergence insufficiency, noting that his biggest challenge is driving, and that he will often get dizzy when scrolling on his phone. (Tr. 709).

On January 6, 2023, Erickson had a telephone encounter with Sarah Lemin, RN, and reported that he had been shopping when "his brain began to go numb, especially in the brain stem/deep brain spot," resulting in imbalance, bilateral leg weakness, and pre-syncope. (Tr. 454). This happened despite Erickson wearing glasses provided by Dr. Zaczyk to prevent such episodes. (*Id.*). RN Lemin felt he was likely experiencing complications from COVID. (*Id.*).

On January 24, 2023, Erickson was evaluated for physical therapy, with chief complaints of neck and head pain, dizziness and imbalance causing impairmments in balance, flexibility, independence in exercise, joint mobility/upper cervical mechanics, posture, range of motion, symptom management, and gaze stabilization. (Tr. 448). He was evaluated by optometrist Drusilla Grant, FCOVD, for light therapy on January 25, 2023, noting he had been engaged in visual therapy and was now interested in optometric phototherapy. (Tr. 864). He reported that since having COVID 14 months prior he had experienced increased light sensitivity, visual motion sensitivity, visual overload, and imbalance. (*Id.*). His kinetic visual field examinations showed mild constriction. (*Id.*). On February 22, 2023, Erickson reported some improvement in his symptoms which he attributed to vision and light therapy, as well as physical therapy. (Tr. 442).

During a May 12, 2023 telephone encounter with Kristi Champion, RN, Erickson reported having "brain pain" again that week although he had some improvement with other symptoms that he attributed to acupuncture and herbal treatments for adrenal dysfunction. (Tr.

438). He was experiencing "head muscle constriction" and light sensitivity due to weather change, and was unable to work on a computer for more than 30 to 45 minutes at a time. (*Id.*). At an office visit on June 1, 2023, Erickson reported with decreased productivity, light sensitivity, and nausea occurring almost daily. (Tr. 432). The headaches started when Erickson believed he had contracted COVID, and while duloxetine had not provided much relief, he had seen benefit from acupuncture. (*Id.*).

Erickson completed his 25th and final vision therapy session on June 12, 2023. (Tr. 657). Dr. Zaczyk indicated that fields were now full and no defects were noted. (*Id.*). On June 28, 2023, Erickson reported two recent falls he attributed to dizziness, stating that certain lights had triggered "autonomic dysfunction" causing him to fall but not lose consciousness. (Tr. 726). Since his falls he had increased waves of vertigo, burning in his feet, frequent diaphoresis, and intolerance to light and heat. (*Id.*).

Erickson had an office visit with ENT Ryan Gerritsen, M.D., on August 3, 2023 to address his dizziness and "now resolved benign positional vertigo of the right ear." (Tr. 913). Erickson reported an incident that occurred on July 4, 2023 where he had a severe bout of dizziness and the room was spinning. (*Id.*). Since then he had undergone an Eppley maneuver that was very beneficial though he still experiences general dizziness on a daily basis. (Tr. 914). At an appointment with Dr. Zaczyk on August 22, 2023, Erickson reported that his sensitivity to sunlight had improved though he still saw floaters in brighter light, and he was constantly dizzy since the July 4th incident. (Tr. 880).

Erickson had an appointment to establish care with James Bavis M.D., on September 18, 2023. (Tr. 1048). His chief complaint was syncope, and he also reported that objects appeared to him to be moving even when they were still. (*Id.*). He had left ear otalgia and tinnitus, was dizzy

when he turned his head, had an unsteady gait, vision changes, and hearing loss. (*Id.*). He further complained of headaches with photophobia and phonophobia 24 days per month, neck pain with "jolts," bilateral facial vibrations and tremors, and excessive daytime sleepiness. (Tr. 1049-51).

At a January 15, 2024 encounter with Dr. Zaczyk, Erickson reported that the glasses she had provided him were helping him enter stores, work on a computer for more than an hour, and drive during the daytime. (Tr. 933). He was, however, struggling with the sympoms of postural orthostatic tachycardia syndrome ("POTS"). (*Id.*). Erickson next attended an otoneurology consultation with Neil Cherlan, M.D., on February 20, 2024, complaining of dizziness, imbalance, profuse sweating, and headaches. (Tr. 1007). The impressions of Dr. Cherlan included complex issues of dizziness, imbalance, headache, neck pain, visual motion sensitivity, and presyncope. (*Id.*). Dr. Cherlan felt there was a likely overlap between peripheral vestibular disturbance, abnormal upper cervical spine biomechanics, migraines, and a tendency toward orthostatic intolerance. (*Id.*).

On March 14, 2024, Erickson was again evaluated to begin physical therapy, with chief complaints including headaches/migraines, dizziness, and imbalance. (Tr. 1194). He described having difficulty with walking, household tasks, bending, and shopping. (*Id.*). His medical history included COVID, anxiety/depression, POTS, and migraines. (*Id.*). He was evaluated for a recertification of his referral for physical therapy on June 2, 2024, and was demonstrating difficulty with walking, physical activities, recreational activities, working, and driving. (Tr. 1166). His prognosis was limited "due to chronic nature of impairments." (*Id.*). The assessment did note improvement in cervical mobility/mechanics, and suggested he may be ready "to progress more with vestibular challenges." (*Id.*).

### C.      Medical Opinion Evidence

#### 1.      State Agency Reviewing Opinion Evidence

On August 2, 2023, state agency reviewing physician Mehr Siddiqui, M.D., opined that Erickson was capable of performing work at the light exertional level, except that he was limited to frequent climbing of ramps and stairs, and could never climb ladders, ropes, or scaffods; he was limited to no noisy environments, such as around factory machinery; and he could have no exposure to unprotected heights, hazardous machinery, or commercial driving. (Tr. 88-90). On November 15, 2023, Maureen Gallagher, D.O., affirmed the opinion of Dr. Siddiqui, but specified that Erickson could not work in a setting where the noise level exceeded 70dB. (Tr. 109-10).

On August 18, 2023, state agency reviewing psychologist Deryck Richardson, Ph.D, opined that Erickson had no more than mild restrictions in any of the mental health domains. (Tr. 87). State agency reviewing psychologist Irma Johnston, Psy.D., affirmed that opinion on November 16, 2023. (Tr. 107-08).

#### 2.      Key Whole Body Assessment – Client Capabilities Overview

Michelle Godek, AT, Ph.D., and Jamie Hart, PT, AT, DPT, conducted a Key Whole Body Assessment to determine Erickson's capabilities on May 15, 2023. (Tr. 415-24). They determined that Erickson was capable of working 6 hours of an 8 hour workday and could sit for 6 hours of a workday in 60 minute increments, stand for 1 hour in 15 minute increments, and walk for 2 to 3 hours occasionally, for moderate distances.  (Tr. 424). He was capable of lifting mostly consistent with the medium exertional level, and could "minimally occasionally" balance, bend/stoop, crawl, crouch, kneel, squat, or climb stairs. (Tr. 417). He could occasionally use his feet, frequently perform simple grasping, and occasionally perform firm or fine grasping. (*Id.*).

He could occasionally hold his head/neck static, and minimally occasionally perform head/neck flexion or rotation. (*Id.*).

### 3.    Treating Source Statements

#### i.    Dr. Zeczyk

On June 14, 2024, Dr. Zeczyk wrote a letter indicating that she had diagnosed Erickson with convergence insufficiency, exophoria and asthenopia, and that, despite having undergone vision therapy, Erickson still had decreased peripheral and depth perception, blurred vision, and migraines as a result of "presumed Post-Acute Sequelae of COVID-19 (long COVID)." (Tr. 1154). Dr. Zeczyk opined that Erickson's symptoms, which occur daily, make typical work functions "nearly impossible," and that he could only work in 10 to 15 minute increments, on a computer or otherwise, before requiring a 1 to 2 hour break. (*Id.*). Without a break, migraines and other symptoms would occur, and even with breaks he still might be incapable of performing up to normal standards. (*Id.*). Driving or walking in a crowded space will aggravate his fatigue, blurred/double vision and headaches, and he will have a very difficult time multi-tasking. (*Id.*).

#### ii.    Dr. Bavis

Dr. Bavis wrote a letter on June 25, 2024 indicating that he was treating Erickson for dysautonomia with orthostatic hypotension, severe migraines, and vertigo, and that he was aware that Erickson suffered from irritable bowel syndrome with diarrhea. (Tr. 1552). Dr. Bavis opined that Erickson is "not well enough to be able to obtain and sustain gainful employment." (*Id.*). He added that Erickson would be at risk of falling or passing out, he would frequently be absent or have to leave early, and would be tardy at least eight times monthly. (*Id.*). Although he has been

10

working hard to improve, Erickson would still require breaks and rest throughout the workday. (*Id.*).

### D.     Administrative Hearing Evidence

Erickson testified before an ALJ on June 24, 2024. (Tr. 45-73). He stated that he limits his driving to side roads around his town, although he will drive to his physical therapy appointments. (Tr. 46). Driving on highways or during rush hour tends to trigger his vertigo symptoms. (*Id.*). Erickson described his greatest struggles preventing him from working to be POTS, dizziness, fainting, fatigue, exhaustion, and dysautonomia. (Tr. 49). He also reports severe migraines, head and neck muscle issues and numbness, brain fog, and confusion. (*Id.*) He explained that he has "supermarket syndrome" meaning that when he enters a retail store his whole body goes numb, he becomes dizzy, and he has, at time, collapsed in the store. (*Id.*).

Erickson further testified that he wears goggles indoors to protect against photophobia and that he will have dizzy spells three to five times weekly. (Tr. 50). The dizziness episodes tend to last about five seconds, and he has been experiencing these episodes for about two and a half years. (Tr. 50-51). The episodes used to last 20 seconds, but have improved with medication. (Tr. 51). He also reported three incidents of fainting in the past year, where he would collapse to the floor but not lose consciousness. (Tr. 51). Typically the episode passes after four to five minutes, but it tends to lead to a migraine that can last into the next day or two. (Tr. 52). He stated that he only started having migraines after an incident when he went to the emergency room, and he has had some improvement in the intensity of the headaches. (Tr. 53).

Erickson added that he had developed tunnel vision, and anything appearing in his peripheral vision became a trigger for vertigo. (Tr. 54). He also has issues with his vision when

11

entering stores, restaurants, or other crowded places. (*Id.*). When his vertigo is triggered by his peripheral vision, it tends to last just a few seconds. (Tr. 55).

Erickson testified that he will do ten minutes of his physical therapy exercises once he is awake in the morning. (Tr. 58). During the day he will make himself his breakfast and lunch, and may do household chores such as washing sheets, which he did the day prior to his hearing. (*Id.*). He also will do neuro physical therapy exercises for 10 to 15 minutes during the afternoon. (*Id.*). His mother will typically cook dinner for him, and after dinner he will write in his long-COVID recovery program journal. (Tr. 59). He will then listen to music before going to bed. (Tr. 59-60). His neighbors will sometimes come to visit with him on the weekends. (Tr. 60). He does not leave home to socialize or for activities, and does not have visitors other than his neighbors. (*Id.*). As for his regular activites, Erickson testified that he has been working on his family ancestry, and he will do laurndry and cleaning although he requires breaks. (Tr. 61).

Under questioning from his attorney, Erickson testified that he wears dark glasses or stays in a dark room because it helps with his migraines. (Tr. 62). He will typically keep the blinds down most of the time. (Tr. 63). He began seeing his optometrist, Dr. Zelczyk, a couple of years ago at the recommendation of his neuro physical therapy team to help with his vision issues and to engage in vision therapy. (*Id.*). At the time of the hearing he was worried about losing his vision because of a blister in his eye. (Tr. 63-64). He also stated that when he has vertigo symptoms he has learned to stop his activities to prevent further episodes. (Tr. 64). Erickson defined differences between the dizziness he attributes to his POTS diagnosis and the spinning he experiences from vertigo. (Tr. 65). He has about two migraines per week, though it can vary from week to week. (Tr. 65-66). He noted that his balance is off, and it causes him to

walk differently than he had previously. (Tr. 66). When he is having a good day, he may leave home alone to walk the dog, but that only happens two or three times weekly. (Tr. 67).

Erickson testified he typically gets tired showering and grooming and will have to take breaks. (Tr. 67-68). He can typically look at his phone screen for about 10 minutes at a time, and is limited in how long he can watch television. (Tr. 68-69). He tries to address his POTS symptoms with medication, high salt and water intake, compression socks, and staying cool. (Tr. 69-70). He complains of "jolts" he gets from where the brain and brainstem meet that are very painful and will cause him to drop. (Tr. 70). Fear of this occurring causes him anxiety. (Tr. 71). He is also depressed, and notes his disappointment in not being able to stay at a job he was enjoying because of his symptoms. (Tr. 71). He is also anxious because he does not know what the future holds with regard to his medical condition. (Tr. 71).

Once Erickson's testimony was completed VE Gail Klier testified. (Tr. 73-80). As there was no past work to classify, the ALJ posed his first hypothetical, asking the VE to presume an individual of the same age and education as Erickson, limited to light work with the additional limitations to frequent climbing of ramps and stairs, but no climbing of ladders, ropes, or scaffolds; no unprotected heights, moving mechanical parts, or operation of a motor vehicle; limited to a moderate noise environment. (Tr. 74). The VE opined that such an individual would be capable of performing work as a routing clerk, DOT 222.687-022, light, SVP 2, with 123,062 jobs available in the national economy; as a mail clerk, DOT 209.687-026, light, SVP 2, with 12,779 jobs in the national economy; and as a cleaner, housekeeping, DOT 323.687-014, light, SVP 2, with 175,699 jobs in the national economy. (*Id.*).

For his second hypothetical the ALJ asked the VE to consider all of the same circumstances of the first hypothetical, except that this individual would also require one extra

13

10 minute break per hour. (*Id.*). The VE opined, based on her education, training, and experience, that this additional limitation would require an accommodation and would therefore be preclusive of all work. (Tr. 74-75). The VE further opined that an employer would tolerate 0-9% off-task time, but at 10% or beyond on a continuing basis of 3 consecutive months and continuing forward it would be work preclusive. (Tr. 75). Further, during a probationary period little to no absence is tolerated, but past that period, two or fewer absences per month will be tolerated if it is not on a chronic level of three consecutive months and beyond. (*Id.*). Even one absence per month will not be tolerated if it were to reach a chronic level of three to six months. (Tr. 75-76).

Under questioning by Erickson's attorney, the VE indicated that the probationary period for jobs that are SVP 1 or 2 will typically last up to 30 days. (Tr. 77). While it varies by employer, the VE testified her opinion about allowable absenteeism counted tardiness or leaving early as absences. (*Id.*). The VE further noted that the DOT does not address lighting, but her opinion was that typical office lighting is the standard, and a dimmer setting could be considered as an accommodation. (Tr. 78). Erickson's attorney then asked if there are jobs the individual from the ALJ's first hypothetical could perform if the individual were further limited to "natural lighting," meaning outside work only. (Tr. 79). The VE opined such an individual could work as a car wash attendant, automatic, DOT 915.667-010, light, SVP 2, with 36,166 jobs in the national economy, but could not immediately identify any further jobs. (Tr. 80).

## IV.    The ALJ's Decision

In his decision dated August 19, 2024, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2.      The claimant has not engaged in substantial gainful activity since November 20, 2021, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3.      The claimant has the following medical impairments: degenerative disc disease of the cervical and lumbar spine, hearing loss, vestibular disorder, migraines, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: The claimant can climb ramps and stairs frequently, never climb ladders, ropes, or scaffolds. He can never work at unprotected heights, near moving mechanical parts, or in positions that require operating a motor vehicle. He can work in no more than moderate noise.

6.      The claimant has no past relevant work.

7.      The claimant was born on July 10, 1970 and was 51 years old, which is defined as an individual closely approaching advance age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 20, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).).

(Tr. 14-29).

15

## V.      Law and Analysis

### A.      Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th

Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant

bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus,

entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.      Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is

supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the

substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S.

Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v.*

*NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

**VI.    Discussion**

Erickson raises three issues for this Court's review:

1.    Did the ALJ err at Step Two and Step Four by failing to determine/discuss all severe and non-severe impairments and thereafter assign all relevant limitations in the final RFC?

2.    Did the ALJ err at Step Four in failing to consider all relevant limitations and finding jobs available in the national economy?

3.    Did the ALJ err at Step Four in finding favorable medical opinions unpersuasive?

**A.    The ALJ properly considered all severe and non-severe impairments when determining Erickson's RFC.**

Erickson contends that the ALJ did not discuss his severe visual impairments when formulating the RFC. (ECF Doc. 9, p. 24). He notes in particular that the ALJ failed to discuss his diagnosis of convergence insufficiency, or any other visual impairment, at Step Two of the sequential analysis, and did not include any limitations to address that impairment. (*Id.*). Further, Erickson asserts, the ALJ did not include a limitation in the RFC that corresponds to the severe impairment of migraines. (*Id.* at 25). In his opinion, if a limitation in the RFC was intended to address that impairment, the ALJ erred in not specifically articulating that connection. (*Id.*).

In response, the Commissioner argues that the ALJ discussed Erickson's visual impairments generally, even if he did not specifically  identify each vision-related impairment. (ECF Doc. 10, p.12). Specifically, the ALJ mentioned that Erickson underwent light therapy for his vision issues, and considered records from 2024 that indicated Erickson's vision was stable and had improved with glasses. (*Id.* at pp. 12-13). Further, the Commissioner disputes Erickson's claims that he was required to directly correlate severe impairments to limitations in the RFC, arguing that the ALJ was only required to explain how the evidence supports the limitations in the RFC. (*Id.* at p. 13).

At the second step of the sequential analysis, the ALJ considers whether the claimant has a "severe impairment."  20 C.F.R. § 416.920(a)(4)(ii), (c). An impairment qualifies as a "severe impairment" only if it is "expected to result in death [or has] lasted or is expected to last for a continuous period of at least 12 months." 20 C.F.R. §§ 416.909, 416.920(a)(4)(ii). The Sixth Circuit has applied a de minimis standard to the Step Two inquiry, meaning that the ALJ must find that a claimant's medically determinable impairment is severe, so long as it has more than a minimal effect and would be expected to interfere with the individual's ability to work. *See Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985) ("'An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.'" (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). If the ALJ determines that the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find that the claimant is not disabled. 20 C.F.R. § 416.920(c).

Step two is a threshold inquiry "intended to 'screen out totally groundless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 61 Fed. Reg. 34474, 34477 (Jul. 2, 1996)). So long as the ALJ considers all the claimant's impairments – severe and non-severe – in the remaining steps of the disability determination, any error at Step Two is harmless. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

19

The ALJ did not articulate any consideration of Erickson's visual impairments, including convergence insufficiency, at Step Two of the sequential evaluation. (Tr. 20-22). This lack would only rise to the level of *harmful* error, however, if the ALJ either failed to find any severe impairments and found Erickson not disabled at Step Two, or if the ALJ failed to consider all of Erickson's impairments in the remaining steps of the sequential evaluation. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). Here, the ALJ found several severe impairments at Step Two and continued the analysis forward (Tr. 20), so the relevant inquiry becomes whether the ALJ considered visual impairments in formulating the RFC. A review of the ALJ's decision confirms that he did, thus rendering the error of failing to raise visual impairments at Step Two harmless.

Specifically, the ALJ noted that the "neuro-opthamologist referred the claimant for visual therapy and syntonic light therapy. In February 2023, he reported 'much improvement' with light therapy." (Tr. 26). Further, the ALJ noted that "[a]t a January 2024 vision exam, the claimant reported that glasses were helping when he went into stores. He was able to use a computer for an hour. He continued to drive. He was able to drive home from stores despite stores causing increased his symptoms. (*sic*)" (Tr. 28 (citing Tr. 933-34)). Despite the improvements noted in his ability to function based on therapy and glasses, the ALJ included a limitation in the RFC that strictly prohibited Erickson from working at unprotected heights, near moving mechanical parts, or in positions that require operating a motor vehicle. (Tr. 23). Such restrictions flow naturally from visual conditions and do not require further explanation. *Stitzlein v. Comm'r of Sec. Sec.,* No. 1:25-cv-808, 25 WL 3537586, at *7 (N.D. Ohio Dec. 10, 2025). Thus, the ALJ properly considered visual impairments when assessing Erickson's RFC, and accounted for those impairments appropriately.

Erickson also argues that the ALJ did not include a limitation in the RFC that corresponds to the severe impairment of migraines, and, even if the ALJ intended for a limitation to relate to this impairment, failed to explain that correlation. (ECF Doc. 9, p. 25). Without such an explanation, Erickson contends, there is no "logical bridge" to allow this Court to perform meaningful judicial review of the the ALJ's decision. (*Id.*). But, as the Commissioner asserts, "an ALJ is required to explain how the evidence supports the limitation that he or she set forth in the claimant's RFC . . .[but] is ***not*** required to produce a detailed statement linking each element to specific evidence supporting it." (ECF Doc. 10, at p. 13, citing *Foley v. Comm'r of Soc. Sec.*, No. 5: 22-cv-00753, 2023 WL 3162097 at *9 (N.D. Ohio April 12, 2023).

Within the the ALJ's explanation of his RFC determination are several references to how he considered Erickson's migraines and headache symptoms. Specifically, the ALJ noted that Erickson testified that "he typically gets migraines after he faints," but "with medication, migraines are less severe. Before medication, his head was numb, and his pain was at a level 7-10/10. Now he has pain at level 4-6/10." (Tr. 24). The ALJ also considered Erickson's primary care source's summary of "Chronic tension-type headaches, not intractable. He's using tizanidine and has been seeing neurology." (Tr. 26). Further, an evaluation performed at the Headache Section Center for Neurological Restoration at the Cleveland Clinic suggested that his headaches may be related to medication overuse, "with migraine features." (Tr. 27). The ALJ notes that this provider did not prescribe preventive or rescue medication specific to migraines, and noted that Erickson's memory was normal, and that his attention and concentration were "excellent." (*Id.*). It is clear from the above that the ALJ carefully considered Erickson's symptoms relating to migraines when formulating the RFC. As he was not required to produce a statement linking each element of the RFC to the specific evidence supporting, the ALJ has built

a satisfactory logical bridge from the evidence to the RFC, and remand is not recommended based on this issue.

>    **B.      The ALJ properly evaluated the expert medical opinions.**

The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including controlling weight to any medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.,* No. 3:20-cv-442, 2022 WL 3445856 (S.D. Ohio Aug. 17, 2022). Supportability and consistency are the most important factors; ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through five when evaluating medical source opinions. (*Id.*).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and non-medical sources in the claim, the more persuasive the medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his [or her] reasoning. *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and*

*recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL 119287 (N.D Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a "minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or court." *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B.*, 2022 WL 3445856, at *3, *citing Warren I. v. Comm'r of Soc. Sec.,* No. 5:20-cv-495, 2021 WL 860506, at *8 (N.D.N.Y., Mar. 8, 2021).

**i.**        Dr. Zaczyk

Erickson contends that the ALJ provided insufficient reasoning to justify his determination that Dr. Zaczyk's opinion was unpersuasive. (ECF Doc. 9, pp. 20-23). Specifically, Erickson takes issue with his sense that the ALJ relied on two factors in finding Dr. Zaczyk's opinion unpersuasive. The first, is that he is able to perform his activities of daily living, and second, that Dr. Zaczyk's statements infringe on the ultimate issue of disability. (*Id.*, at p. 20). Erickson argues that the ALJ overstated his participation in some activities "as a means to discredit Dr. Zaczyk" while also failing to mention his limitations with other activities. (*Id.* at pp. 20-21). Erickson continues that this use of his limited activities as "a tool against favorable opinions" has been viewed disfavorably by the courts, and does not reflect the reality that, as his treating source, no one is in a better position to evaluate Erickson's capabilities than Dr. Zaczyk. (*Id.* at pp. 21-22). Finally, Erickson argues that the ALJ did not account for the consistency between the opinions of Dr. Zaczyk and Dr. Bavis with regard to absenteeism, and does not properly address the issue of absenteeism that was raised in both opinions. (*Id.* at 22-23).

23

The Commissioner responds that substantial evidence supports the ALJ's determination that Dr. Zaczyk's opinion was unpersuasive. (ECF Doc. 10, p. 10). In the Commissioner's view, the ALJ addressed both supportability and consistency in evaluating Dr. Zaczyk's opinion. (*Id.* at p. 11). While the Commissioner agrees that merely citing to Erickson's daily activities alone would be insufficient to establish the ability to engage in full-time work, consideration of those activities is a legitimate factor to be considered in determing the RFC. (*Id.*).

As noted above, 20 C.F.R. § 404.1520c(c)(1) governs an ALJ's evaluation of the persuasiveness of a medical opinion, and mandates that the ALJ articulate how they considered the critical factors of supportability and consistency. On a review of the entire ALJ decision, the ALJ's articulation of how he considered Dr. Zaczyk's opinion satisfies his regulatory obligation. Although not expressed efficiently in a single comprehensive paragraph, the ALJ's explanation was sufficient to understand the reasoning behind his conclusion that the opinion was unpersuasive. *See Bradley v. Comm'r of Soc. Sec.* 1:23-cv-00082, 2023 WL 8529099, at *9 (N.D. Ohio December 8, 2023). So long as there is sufficient detail to permit meaningful review, the ALJ need not incorporate  all of the information he relied on into a single tidy paragraph. *See Buckhannon ex rel. J.H. v. Astrue,* 368 F.App'x 674, 678-79 (7th Cir. 2010 (noting that the court "read[s] the ALJ's decision as a whole and with common sense")).

With regard to supportability, the ALJ noted that at a January 2024 vision exam with Dr. Zaczyk, "the claimant reported that glasses were helping when he went into stores. He was able to use a computer for an hour. He continued to drive. He was able to drive home from stores despite stores causing increased [*sic*] his symptoms." (Tr. 28, 933-34). These findings do not support Dr. Zaczyk's opinion that he can only work in 10 to 15 minute increments before needing a 1 to 2 hour break due to vision fatigue. (Tr. 1154).

As to consistency, the opinion indicates that Erickson's symptoms were based on "presumed Post-Acute Sequelae of COVID-19 (PASC) or as it is commonly called, long COVID." (*Id.*). The ALJ notes that there is no evidence of of COVID infection to support this determination. (Tr. 30). Further, this is inconsistent with Erickson's testimony that he is currently working on his ancestry/family tree, can walk his dog, and attend homeowners meetings, and his indication in a function report that he is able to make breakfast, read the news, care for his own personal needs, and perform household chores. (Tr. 292-301). Additionally, it is inconsistent with reports in the record that he had enrolled in vision and syntonic light therapy, and that had brought about "much improvement." (Tr. 26, 442).

When the ALJ's analysis is read as a whole and with common sense, it is apparent that the ALJ appropriately articulated his findings regarding the persuasiveness of Dr. Zaczyk's opinion, describing substantial evidence to support his evaluation. It is outside of the court's purview to decide the facts anew, evaluate credibility, or re-weigh the evidence, so long as the ALJ's determination meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. As the ALJ's assessment that Dr. Zaaczyk's opinion was unpersuasive is based on substantial evidence, that assessment is within the "zone of choice" within which to decide cases without court interference, and should not be disturbed. *Mullen*, 800 F.2d at 545.

### ii. Dr. Bavis

Erickson contends that the ALJ's reasoning in determining that Dr. Bavis's opinion was unpersuasive was inconsistent with the record as a whole. (ECF Doc. 9, p. 19). Specifically, Erickson asserts that the ALJ failed to properly address issues raised by Dr. Bavis concerning Erickson's migraines and his absenteeism as it relates to both his migraines and the high volume

of medical appointments he attends. (*Id.* at pp. 19-20). In Erickson's view, the ALJ "ignores the actual medical records and the fact that [he] had ongoing issues with migraines." (*Id.* at p. 20).

The Commissioner responds by first arguing that Dr. Bavis' statement within the opinion that Erickson is unable to work is an issue of disability, reserved for the Commissioner, and is therefore "neither valuable nor persuasive." (ECF Doc. 10, p. 9). Further, in assessing Dr. Bavis' opinion, the Commissioner contends, the ALJ properly addressed the critical factors of supportability and consistency to support his evaluation. (*Id.* at pp. 9-10). Thus, substantial evidence supports the ALJ's determination. (*Id.* at p. 10).

The Commissioner is correct that statements within Dr. Bavis' opinion which aver that "despite his best efforts, the patient is still not well enough to be able to obtain and sustain gainful employment" crosses into territory reserved for the Commissioner's consideration. (Tr. 29, 1552). The ALJ was not required to address these statements made by Dr. Bavis, as the regulations establish that any "[s]tatements on issues reserved to the Commissioner," such as whether a person is or is not "disabled, . . . able to work, or able to perform regular or continuing work," are "inherently neither valuable nor persuasive." 20 C.F.R. § 404.1520b(c)(3)(i). The ALJ was therefore not required to "provide any analysis about how [he] considered such evidence in his determination or decision." 20 C.F.R. §404.1520b(c); *Walton v. Comm'r of Soc. Sec.*, No. 1:23-cv-1408, 2024 WL 3387300, at \*21 (N.D. Ohio June 24, 2024).

In his review of the remainder of Dr. Bavis' opinion the ALJ clearly addresses the key issues of supportability and consistency in articulating why he found the opinion unpersuasive. The ALJ notes that the opinion's declaration that Erickson is a fall risk is inconsistent with "the lack of ambulatory aids, consistently normal gait, and no documented syncope events" and unsupported by Dr. Bavis' normal examination of Erickson is February 2024. (Tr. 29, citing Tr.

1100-1111). That exam noted "normal observation of gait and transfers . . . normal functional

balance and no fall reactions. (Tr. 1111). Further, the ALJ clearly addressed consistency with the

record, writing:

> No source has restricted the claimant from driving, as would be expected if they felt the claimant may pass out at any time. There have been no injuries caused by falls. There is no explanation for the proposed attendance issues. This source did not support the opinion with any clinical or objective findings, and merely cited to subjective symproms and the factthat the claimant is treated by multiple sources. The record also lacks support for such limitations. The mostly normal clinical and objective findings, conservative care, excellent and punctual attendance at treatment, lack of interest in medications that treating specialists recommended, good response to conservative measures (such as low dose Cymbalta, acupuncture, physical therapy) and daily activities are inconsistent with this opinion.

(Tr. 29-30). As the ALJ properly addressed the critical factors of supportability and consistency

relative to Dr. Bavis' opinion, I do not recommend remand on this basis.

### iii.    Dr. Godek

Finally, Erickson objects to the ALJ's determination that the Client Capability Overview

performed by Dr. Godek was unpersuasive. (ECF Doc. 9, pp. 23-24). Erickson expresses concern

that the ALJ discounted the findings in part because it represented a single visit to Dr. Godek, yet

the ALJ found the opinions of the state agency reviewing physicans more persuasive when they

had never examined him. (*Id.* at p. 23). Further, Erickson argues that the ALJ's support for his

finding of unpersuasiveness was nothing more than "boilerplate reasoning" in that it does not

provide citation or detail and explanation about what about this examination he found to be

"[in]consistent with the longitudinal exams." (*Id.* at p. 23).

The Commissioner counters that any error with the ALJ's evaluation with the Client

Capability Overview was harmless, as the RFC determination by the ALJ was more restrictive

than the functional capacity determination of Dr. Godek. (ECF Doc. 10, p. 12). Further,

throughout the decision the ALJ discussed unremarkable examinations and activities of daily

living that were inconsistent with Dr. Godek's proposed limitations. (*Id.*). Thus, the Commissioner contends that substantial evidence supports the ALJ's determination that Dr. Godek's opinion was unpersuasive. (*Id.*).

Again the question to be answered by this Court is whether the ALJ properly evaluated the opinion expressed by Dr. Godek, with articulation of how he considered the critical factors of supportability and consistency. The issue of supportability was addressed, as the ALJ specifically noted that this was "a one-time examination, with no longitudinal treating relationship." (Tr. 30). The ALJ further addressed supportability, writing that the opinion "relied heavily on subjective complaints of vertigo and self-reports of a need for glasses and dim lighting," suggesting a lack of objective support for the findings. (*Id.*). With regard to consistency, the ALJ wrote that the condition of vertigo, and the need for glasses and dim lighting, was inconsistent with the record as "these conditions were not requested at neurology or other visits, nor did the treating specialists suggest a need for such conditions." (*Id.*). The ALJ added that the "clinical exams have been consistently normal at treating source visit, which is not consistent with this one-time exam." (*Id.*). As the ALJ addressed both supportability and consistency, with ample reasoning to build a logical and accurate bridge between the opinion and his determination of its unpersuasiveness, he met his burden for the evaluation of this opinion. I therefore do not recommend remand.

C.     **The ALJ properly considered the issue of absenteeism in determining Erickson's RFC.**

Erickson argues that it is the Commissioner's burden to prove that jobs existed for him in the national economy, and the ALJ's opinion failed to meet that burden as it did not address the issue of absenteeism in the RFC and did not explain why absenteeism was not applicable at steps four and five of the sequential evaluation. (ECF Doc. 9, p. 16). Specifically, Erickson asserts that

28

the decision did not address the issue of absenteeism based on his extensive schedule of medical appointments, despite it being raised during the administrative process. (*Id.*). Erickson adds that the opinion further fails to address the impact of absenteeism during a probationary work period, an issue Erickson raised at the hearing and in a post-hearing memorandum. (*Id.* at p. 17).

The Commissioner responds by asserting that Erickson's volume of medical appointments alone does not support a finding of disability based on absenteeism because there is no evidence indicating that the appointments could not be scheduled around work hours, and this Court rejected a similar argument in *Chaney v. Comm'r of Soc. Sec.,* 2020 WL 789189 (N.D. Ohio Feb. 18, 2020). (ECF Doc. 10, at p. 6 (citing *Chaney* at *8)). Further, the Commissioner argues that there is substantial evidence that supports the omission of absenteeism-related limitations, as neither of the state agency reviewing psychologists found that Erickson had any such restrictions. (*Id.* at p. 7). The Commissioner also asserts that the omission of absenteeism-related limitations is consistent with "the record that shows mostly normal clinical and objective findings, conservative treatment, and excellent and punctual attendance at treatments." (*Id.*).

Erickson submits that the Commissioner's citation to *Chaney* is inappropriate here, because unlike in *Chaney*, he is challenging the absenteeism issue at Step Five of the sequential evaluation, and because here Erickson elicited testimony from the VE about the impact of tardiness and leaving work early on the question of absenteeism. (ECF Doc. 11, pp. 1-2).

The Commissioner has the better of this argument. Erickson relies on the medical expert opinions of his two treating sources, Dr. Zeczyk and Dr. Bavis, to support the contention that the ALJ should have directly addressed the issue of absenteeism. (ECF Doc. 9, p. 15). Specifically, Dr. Zeczyk wrote:

> Given my findings during the therapy sessions, I can estimate he can only work for
> 10-15 minute increments (on a computer or otherwise) before needing to take at

> least a 1-2 hour break in order to be able to function again. Without the visual break, migraines and his other symptoms will surely occur and will then result in him being unable to perform work for the rest of the day or longer. Even with a long break such as what was outlined above, I am hesitant to state that he would able to perform up to typical standards of a person without visual limitations.

(Tr. 1154). Notably, the ALJ found Dr. Zeczyk's opinion unpersuasive, writing, in part, "This assessment is not persuasive or supportable because it is a gross overestimate of limitations." (Tr. 30). The ALJ added that "[t]he suggestion of only being able to work for 15 minute increments is not well-supported, and is not consistent with [his] daily activities." (*Id.*).

Additionally, Dr. Bavis wrote, "It is estimated that he would be absent frequently, he would have to leave work frequently, and he would be tardy at least 8 days a month. Additionally, he would need breaks and rests many times throughout the work day." (Tr. 1552). The ALJ also found this opinion unpersuasive, writing, in part, "[t]here is no explanation for the proposed attendance issues. This source did not support the opinion with any clinical or objective findings, and merely cited to subjective symptoms and the fact that the claimant is treated by multiple sources." (Tr. 30).

First, it is important to note that Erickson has not established that his concerns relating to absenteeism are in fact an issue to be addressed at Step Five of the sequential evaluation. The question of whether a limitation based on absenteeism is properly concerned when formaulting the RFC. *See Smith v. Comm'r of Soc. Sec.*, 1:25-cv-1085, 2026 WL 32075 at *6 (N.D. Ohio, Jan. 6, 2026. There has been no support offered to establishes that the lack of an absenteeism limitation in the ALJ's RFC is a Step Five issue for which the ALJ had the burden of proof. (*Id.*). The Step Five regulations required only that the ALJ ask the VE to consider Erickson's age, education, work history, and RFC when determining if jobs he could perform existed in the national economy. *Id.*; 20 C.F.R. §416.920(a)(4)(v). As the ALJ had already determined that

limitations related to absenteeism were unwarranted when he established the RFC, there was no requirement that the issue be raised again at Step Five.

The actual question for this Court's consideration is whether substantial evidence supports the ALJ's finding that no limitation relating to absenteeism should be included in the RFC. The Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. The threshold for substantial evidence is not high, and has been defined as "more than a scintilla." *Biestek*, 880 F.3d at 103. Here, the ALJ satisfied this requirement. Specifically, in finding the Dr. Bavis' expert opinion unpersuasive, the ALJ noted there was "no explanation for the proposed attendance issues." (Tr. 29). He further wrote that the record lacked support for such limitations as there were "mostly normal clinical and objective findings, conservative care, excellent and punctual attendance at treatment, lack of interest in medications that treating specialists recommended, good response to conservative measures (such as low dose Cymbalta, acupuncture, physical therapy) and daily activities . . . inconsistent with this opinion." (Tr. 29-30). This explanation easily surpasses the "more than a scintilla" standard established by *Biestek*, and provides substantial evidence in support of the ALJ's determination that no limitations relating to absenteeism were required.

With regard to Erickson's contention that his past schedule of medical appointments is indicative of a need for limitations for absenteeism, the discussion in *Chaney* is indeed probative. As noted above, this question is properly considered in the formulation of the RFC, rather than at Step Five, so this case is not distinguishable from *Chaney* in the manner Erickson suggests. As the Court explained in Chaney:

> As the Tenth Circuit has explained: "[P]laintiff's current extrapolation of how many days she must have missed from work based on her medical record is faulty ... in

31

that it assumes she was required to miss entire days of work for each appointment." *Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000); *see also Pryor v. Comm'r of Soc. Sec.*, 2015 WL 12683977, at *7 (E.D. Mich.) ("Pryor has not established any reason to think that he is unable to attend physical therapy sessions after work, on the weekends, during lunch, or on some other schedule."), *report and recommendation adopted*, 2015 WL 6735336; *Leaverton v. Colvin*, 2013 WL 1316901, at *3 (N.D. Okla.) ("Plaintiff added up the number of doctor visits and phone calls to his doctor he made over the pendency of this case and argues that number of absences would preclude employment. Nothing in the record suggests an entire day off is necessary for each appointment or that appointments could not be scheduled around hours of employment."); *Brock v. Astrue*, 2008 WL 4104551, at *16 (W.D. Mo.) ("Further, the fact that a claimant must attend regular healthcare appointments does not necessarily indicate that she cannot work; there is nothing in the record to indicate that Brock could not schedule her appointments around her work schedule.").

*Chaney*, 2020 WL 789189 at *9. Erickson has provided no evidence to suggest that his appointments could not occur outside of work hours, or that those appointments would necessarily be work preclusive. Accordingly, this argument fails, and remand is not appropriate on this basis.

## VII. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend the Commissioner's final decision denying Erickson's applications for DIB and SSI be affirmed.

Dated: April 28, 2026

Reuben J. Sheperd
United States Magistrate Judge

32

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)